# In the United States Court of Federal Claims

No. 21-1775
(Filed: May 19, 2025)

```
*************************************
                                      *
AARON MCLAUGHLIN and ANITHA          *
WILLIAMS,                             *
                                      *
                    Plaintiffs,       *
                                      *
         v.                           *
                                      *
THE UNITED STATES,                    *
                                      *
                    Defendant.        *
*************************************
```

*Charlotte H. Schwartz*, James & Hoffman, P.C., Washington, DC, counsel for Plaintiffs. With whom were *Daniel M. Rosenthal* and *Emily R. Postman*, and *Linda Lipsett*, Bernstein & Lipsett, P.C., Washington, DC, of counsel.

*Elinor J. Kim*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

On behalf of themselves and those similarly situated, Aaron McLaughlin and Anitha Williams, Senior Watch Officers at the Office of the Director of National Intelligence ("ODNI"), seek backpay and other damages arising from the government's alleged failure to properly compensate them for overtime under the Fair Labor Standards Act of 1938 ("FLSA") and 5 U.S.C. § 5596 ("Back Pay Act"). Before the Court are the parties' cross-motions for summary judgment on whether the plaintiffs are exempt from the FLSA's overtime provisions and whether they were properly placed on an alternative work schedule ("AWS"). For the reasons stated below, the Court finds that there are genuine issues of material fact regarding the plaintiffs' duties that preclude granting summary judgment on their FLSA exemption status. However, the Court further finds that the undisputed evidence shows that the plaintiffs were not properly placed on a flexible or compressed schedule and that, therefore, they are entitled to judgment as a matter of law on whether they were properly placed on an AWS. Thus, the government's motion for summary judgment is **DENIED**, and the plaintiffs' cross-motion for partial summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.    BACKGROUND

Mr. McLaughlin and Ms. Williams were employed as Senior Watch Officers at the ODNI

from October 2019 to October 2021.[1] Compl. [ECF 1] ¶¶ 7-8; Def.'s Mot. Summ. J. [ECF 35] at 3; Pls.' Mot. Summ. J. [ECF 38] at 9.[2] The mission of ODNI is to "[l]ead and support Intelligence Community integration; delivering insights, driving capabilities, and investing in the future." [ECF 35-1] at 48. "The DNI Watch provides 24/7 global intelligence situational awareness in support of ODNI's mission." *Id.* at 123. "One of the Watch's primary responsibilities is to provide ODNI customers, including the DNI [Director of National Intelligence] and PDDNI [Principal Deputy Director of National Intelligence], all-source reporting that is strategic, credible, and timely to assist in the performance of their duties." *Id.* ODNI Watch customers also include "National Intelligence Managers (NIMs), National Intelligence Officers, ODNI Centers (National Counterterrorism Center, National Counterintelligence and Security Center, National Counterproliferation and Biosecurity Center, Cyber Threat Intelligence Integration Center, and the Foreign Malign Influence Center), ODNI senior leaders and their counterparts at various intelligence agencies, the White House, cabinet-level agencies, and other government organizations." [ECF 35] at 3-4.

The ODNI Watch supports the mission of the ODNI by "monitoring and sorting intelligence and operation message traffic and sharing intelligence information in a timely and accurate manner within the agency and with external partners." [ECF 1] ¶ 9. It operates twenty-four hours a day, seven days a week, and is "comprised of three different stations that receive alerts from different sources: emails, internet cables, and open-source news outlets (such as CNN or the New York Times)." [ECF 38] at 9; *see also* [ECF 35-1] at 363-64, 373-74. As Senior Watch Officers, the plaintiffs were government employees who generally manned one of the three Watch Officer stations alongside two or three contracted Watch Officers. [ECF 35] at 4; [ECF 38] at 10. All Watch Officers rotate between the three stations and Senior Watch Officers shared "the same role, major duties, and responsibilities" as contracted Watch Officers. [ECF 35] at 5; [ECF 38] at 10. The Watch Officer stations were staffed by five teams working in twelve-hour shifts. *See* [ECF 35] at 4, 10; [ECF 38] at 13. Senior Watch Officers worked a five-week work cycle consisting of two weeks of twelve-hour day shifts, two weeks of twelve-hour night shifts, and one administrative week. [ECF 35] at 10; [ECF 38] at 13-14. During the administrative week, which was used primarily for trainings, Senior Watch Officers did not work a set number of hours per day and had no set arrival or departure times. *See* [ECF 35] at 10; [ECF 38] at 14. ODNI classified this schedule as "maxi-flex" and did not label it as a compressed work schedule. [ECF 35] at 11; [ECF 38] at 15. Additionally, while Senior Watch Officers were classified as FLSA-exempt, [ECF 38] at 16; [ECF 35-1] at 307-08, they did receive overtime pay for officially authorized hours over the eighty-hour biweekly work requirement.[3] [ECF 35] at 30; [ECF 38] at 40. During the time relevant to the instant case, DNI Watch Chief Karen M. and DNI Watch Deputy Chief Seth T. supervised the Senior Watch Officers. *See* [ECF 35] at 18; [ECF 38] at 9.

---

[1] In addition to "Senior Watch Officer," the position the plaintiffs held is also referred to as "Senior Duty Officer," [ECF 1] ¶ 7 n.1, "Watch Officer (Government) Lead," [ECF 35-1] at 264, "Senior Government Lead," *id.*, "Operations Officer," *id.* at 260, and "Senior Operations Officer," *id.* at 262, among others. The Court refers to the position as "Senior Watch Officer," as stated in the complaint. *See* [ECF 1] ¶¶ 7-8.

[2] All page numbers in the parties' briefs refer to the page numbers generated by the CM/ECF system.

[3] Here, overtime pay refers to "premium pay, which is defined as 'additional compensation for overtime, night, Sunday, and holiday work.'" [ECF 35] at 12 (quoting ODNI Instruction 73.06(U)(6)(A)(2)).

On August 30, 2021, the plaintiffs filed a complaint, on behalf of themselves and all those similarly situated, alleging that the United States failed to properly compensate them for overtime in violation of the FLSA and the Backpay Act. *See* [ECF 1]. They assert that the government "misclassified [Senior Watch Officers] as FLSA exempt from 2018 to the present," thereby causing them to "receive[] compensatory time or overtime pay at a rate less than they are due under the FLSA." *Id.* ¶ 17. Alternatively, they contend that they are entitled to overtime compensation "[f]rom at least 2019 and continuing to [August 2021]," *id.* ¶ 27, under "Title 5 of the United States Code for working in excess of 8 hours each day and/or 40 hours each week," *id.* ¶ 18. They request that the Court order the government to "conduct a full, complete and accurate accounting of all back overtime wages, premium and other pay, leave, holiday, and excused and other paid absence compensation, and benefits, interest, and liquidated damages due and owing to Plaintiffs" and award them such compensation. *Id.* at 6.

The parties completed discovery and filed cross-motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") as to whether the plaintiffs are exempt from the overtime provisions of the FLSA and whether the plaintiffs were properly placed on an AWS for the purpose of determining overtime pay. *See* [ECF 35] at 2; [ECF 38] at 7. The cross-motions are fully briefed, [ECF 35]; [ECF 38]; Def.'s Reply & Resp. [ECF 39]; Pls.' Reply [ECF 40], and the Court held oral argument on November 13, 2024, [ECF 43].

## II.     STANDARD OF REVIEW

Summary judgment may be entered on part of a claim or defense if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(a); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004). An issue is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. "The moving party bears the burden of demonstrating the absence of genuine issues of material fact." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "To establish 'that a fact cannot be or is genuinely disputed,' a party must 'cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials.'" *Shea v. United States*, 136 Fed. Cl. 95, 102 (2018) (alterations in original) (quoting RCFC 56(c)(1)). "The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op.*, 16 F.3d at 1202 (citing *Celotex Corp.*, 477 U.S. at 325). "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 255). On cross-motions for summary judgment, "each motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). "[A]t

the summary judgment stage[,] the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." *Grandits v. United States*, 66 Fed. Cl. 519, 523 (2005) (citing *Anderson*, 477 U.S. at 250-52; *Jay v. Sec'y of Dep't of Health and Hum. Servs.*, 998 F.2d 979, 982 (Fed. Cir.)).

## III.    DISCUSSION

The government argues that the plaintiffs are not entitled to FLSA overtime pay because their work "was properly classified as FLSA exempt" under the administrative exemption. [ECF 35] at 16. The government also argues that the plaintiffs "are not entitled to overtime pay based on a standard work schedule . . . because their basic work requirement was a non-standard shift schedule." *Id.* at 27 (capitalization omitted). The plaintiffs counter that "the [g]overnment has failed to meet its burden to establish that Plaintiffs were exempt from the FLSA's overtime requirement," [ECF 38] at 22, and that the plaintiffs are entitled to overtime pay based on a standard work schedule because they "were not properly placed" on a nonstandard schedule, *id.* at 39. As explained below, the Court finds that there are genuine issues of material fact regarding the plaintiffs' duties that preclude granting summary judgment on whether the plaintiffs are exempt from the FLSA overtime requirement under the administrative exemption. With respect to the plaintiffs' work schedule, the Court finds that they are entitled to judgment as a matter of law. The plaintiffs' work schedule does not constitute either an authorized flexible or compressed work schedule.

### A.       The Plaintiffs' Exemption Status Under the FLSA

"The FLSA empowers [the United States Office of Personnel Management ("OPM")] to promulgate regulations implementing the Act's provisions as they apply to employees of the federal government . . . and OPM has invoked this authority to adopt regulations located at 5 C.F.R. §§ 551.101 through 551.710." *Shea*, 136 Fed. Cl. at 102 (citing 29 U.S.C. § 204(f)). Employees of federal agencies are "presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of the exemptions . . . and such supplemental interpretations or instructions issued by OPM." 5 C.F.R. § 551.202(a). "Exemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption." *Id.* § 551.202(b). "If there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee will be designated FLSA nonexempt." *Id.* § 551.202(d). "The burden of proof rests with the agency that asserts the exemption." *Id.* § 551.202(c); *see also Adams v. United States,* 65 Fed. Cl. 195, 199 (2005) (citing *Berg v. Newman*, 982 F.2d 500, 503 (Fed. Cir. 1992)) ("The Federal Circuit has recognized that the government has the burden of demonstrating that an employee is exempt from FLSA overtime provisions."). Where an agency asserts that an employee is FLSA-exempt under the administrative exemption, it must satisfy the criteria outlined in 5 C.F.R. § 551.206. *See* 5 C.F.R. § 551.202(a). Section 551.206 provides:

An administrative employee is an employee whose primary duty is

4

the performance of office or non-manual work directly related to the
management or general business operations, as distinguished from
production functions, of the employer or the employer's customers
and whose primary duty includes the exercise of discretion and
independent judgment with respect to matters of significance.

5 C.F.R. § 551.206. Accordingly, to determine whether an employee properly falls under the
administrative exemption, the Court must first identify the employee's primary duty. *Shea v.
United States*, 143 Fed. Cl. 320, 330 (2019) (citing 5 C.F.R. § 551.206) ("A prerequisite to
applying the administrative exemption is identifying [the employee's] primary duty."), *aff'd*, 976
F.3d 1292 (Fed. Cir. 2020). The Court must then evaluate "whether the primary duty involves
the performance of office or non-manual work," "whether the primary duty is directly related to
the employer's management or business operations, as distinguished from production functions,"
and "whether the primary duty involves the exercise of discretion as to matters of significance."
*Shea*, 136 Fed. Cl. at 103 (citing 5 C.F.R. § 551.206). Here, the parties dispute (1) the primary
duty of Senior Watch Officers, [ECF 39] at 8-11; [ECF 40] at 6-10; (2) whether aspects of the
primary duty directly relate to the management or general business operations of the ODNI,
[ECF 39] at 12-17; [ECF 40] at 14-17; and (3) whether the primary duty includes the exercise of
discretion and independent judgment with respect to matters of significance, [ECF 35] at 24-27;
[ECF 38] at 29-31.[4]

### 1.    The Primary Duty of Senior Watch Officers

Under 5 C.F.R. § 551.104, a "[p]rimary duty typically means the duty that constitutes the
major part (over 50 percent) of an employee's work." The Court's determination of whether a
duty constitutes a primary duty "rest[s] on the duties actually performed by the employee." *Shea*,
143 Fed. Cl. at 329 (citing 5 C.F.R. § 551.202(e)). "Whether or not an employee's duty falls
under an exemption to the FLSA is a question of law, while the nature of the employee's duties
is a question of fact." *King v. United States*, 119 Fed. Cl. 277, 283 (2014) (citing *Icicle Seafoods,
Inc. v. Worthington*, 475 U.S. 709, 714 (1986)), *aff'd*, 627 F. App'x 926 (Fed. Cir. 2016).

Here, the plaintiffs' primary duty was to "maintain[] 24/7 global situational awareness."
[ECF 35] at 16; [ECF 38] at 22. Indeed, the government states that this duty "was plaintiffs'
entire job and a full-time one at that," [ECF 35] at 16, and the plaintiffs agree, [ECF 38] at 22.
Further, this determination is supported by the undisputed evidence. The Senior Watch Officer
position description states that a major duty and responsibility was to "maintain 24/7 global
situational awareness by independently researching and analyzing raw intelligence reporting and
maintaining awareness of current intelligence issues." [ECF 35-1] at 260, 262. The deposition
testimony indicates that the plaintiffs spent "the whole 12-hour shift" gathering information and
researching, *id.* at 384 (quoting Ms. Williams' deposition), that "tak[ing] information in and
disseminat[ing] it out" comprised "ninety-nine" percent of the plaintiffs' job, *id.* at 361 (quoting
Mr. McLaughlin's deposition), and that "probably half of every hour" or more, was spent at the
three information stations, [ECF 38-1] at 23-28 (quoting Seth T.'s deposition). It further
indicates that the plaintiffs' duty to monitor and alert others of high-profile intelligence

---

[4] The parties do not dispute that the plaintiffs' primary duty consisted of office or non-manual work. [ECF 35] at 20;
[ECF 38] at 20 n.5. As such, the Court does not analyze this criterion of the administrative exemption.

information constituted "most of their shift." [ECF 35-1] at 390-92 (quoting Karen M.'s deposition). Therefore, the plaintiffs' duty to maintain 24/7 global situational awareness—researching, analyzing, and disseminating intelligence information—constituted their primary duty under the FLSA.

Nevertheless, the government contends that the plaintiffs' primary duty "also included serving as a team lead." [ECF 39] at 8. The government argues that "the team lead function of a Senior Watch Officer may be credited as a primary duty even if it constituted less than 50 percent of their work." *Id.* at 9. In essence, the government asserts that serving as team lead is an alternative primary duty. *See id.* at 8. For the plaintiffs' team lead function to qualify as an alternative primary duty, the government must demonstrate that it satisfies the requirements of 5 C.F.R. § 551.104. Section 551.104 provides:

> A duty constituting less than 50 percent of an employee's work (alternative primary duty) may be credited as the primary duty for exemption purposes provided that duty:
>
> (1) Constitutes a substantial, regular part of the work assigned and performed;
>
> (2) Is the reason for the existence of the position; and
>
> (3) Is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment as discussed in § 551.206, and the significance of the decisions made.

5 C.F.R. § 551.104. These requirements are written in the conjunctive—meaning that all the elements must be met for a duty to qualify as an alternative primary duty. *See Shea*, 143 Fed. Cl. at 332 (treating the alternative duty requirements as conjunctive). If a duty qualifies as an alternative primary duty, it also must meet the requirements for the administrative exemption found in 5 C.F.R. § 551.206. *See Adams*, 65 Fed. Cl. at 203. In this case, because there are factual disputes regarding each of the alternative primary duty requirements, the Court cannot determine whether the plaintiffs' team lead function qualifies as an alternative primary duty.

With respect to the first requirement of the alternative primary duty test, the government argues that the "plaintiffs' team lead function was a substantial and regular part of their work, which was performed each 12-hour shift workday and covered the entire shift period." [ECF 39] at 9. The government relies on self-evaluations and deposition testimony to show that the plaintiffs performed the team lead function throughout their watch shift. *Id.* (citing [ECF 35-1] at 277, 281; [ECF 39-1] at 4-6, 10-11). The plaintiffs, on the other hand, argue that the team lead function is not detailed in the position description and that the Senior Watch Officers spent little time on the team lead function. *See* [ECF 40] at 9-10. The plaintiffs similarly rely on deposition testimony to support their argument. *Id.* (citing [ECF 38-1] at 26-27, 31, 73). Furthermore, the parties disagree about the percentage of time the Senior Watch Officers spent on the team lead function. *Compare* [ECF 35-1] at 402-03 (Seth T. testifying that the Senior Watch Officers spent

fifty percent of their time "looking at everything that's getting done across the team and . . . making sure it's getting done correctly") *with* [ECF 35-1] at 361-62 (Mr. McLaughlin testifying that he performed the duty of "tak[ing] in information and disseminat[ing] it out" as ninety-nine percent of his work). As a result, there are factual disputes regarding the first requirement of the alternative primary duty test.

Next, regarding the second requirement, the government argues that "the Senior Watch Officer position existed because ODNI did not want to entrust [team lead] responsibilities to contractors." [ECF 39] at 10. In support of its position, the government points to the DNI Watch Standard Operating Procedure, [ECF 35-1] at 98; a document detailing the responsibilities of Senior Watch Officers, *id.* at 264-65; and deposition testimony, [ECF 39-1] at 8-9. The plaintiffs dispute this evidence, arguing that it "says nothing about the reason the position exists." [ECF 40] at 9. The plaintiffs also argue that the deposition testimony indicates that "the contractor and employee Watch Officers performed essentially all the same duties," and that, therefore, the team lead duties are not the reason for the existence of the position. *Id.* (citing [ECF 39-1] at 8-9). As with the first requirement, the Court finds that there is a factual dispute over whether the team lead function is the reason for the existence of the plaintiffs' Senior Watch Officer position.

Finally, as to the third requirement—whether the plaintiffs' team lead function is clearly exempt work—the government argues that "the basic nature of Senior Watch Officers' work as team leads was to ensure that their respective team members (comprised of 1-2 contractors) followed the proper procedures, policies, methods, and priorities of the ODNI and its customers, and thereby clearly involved exempt work." [ECF 39] at 11. The government also argues that the plaintiffs "exercised discretion and independent judgment on how they would carry out their team lead activities" and that "the work plaintiffs performed as team lead involved matters of significance." *Id.* The government relies on deposition testimony to show that the plaintiffs apportioned the work of the other watch officers, trained them, and directed and monitored their work. *Id.* (citing [ECF 35-1] at 395-96; [ECF 38-1] at 25-26; [ECF 39-1] at 5-6, 10-11, 26). In contrast, the plaintiffs assert that "[t]he record contains no evidence that the team lead duty involved any substantial responsibility," and that the team lead function "appears to have primarily consisted of dividing up work between employee and contractor Watch Officers each shift." [ECF 40] at 10. The plaintiffs rely on deposition testimony to show that this apportionment process was informal and not representative of a management duty. *Id.* at 11 (citing [ECF 38-1] at 25-26, 116-17). The plaintiffs also assert that the deposition testimony reflects that the "team leads were generally peers of contractor Watch Officers," as opposed to "any kind of manager." *Id.* (citing [ECF 38-1] at 116-17, 120). Further, the plaintiffs dispute the government's contention that they exercised discretion and judgement on matters of significance. [ECF 40] at 12. They argue that "[t]here is no evidence that Plaintiffs' nominal role in dividing work involved any actual discretion or was a matter of significance," or that there was any "discretion or independent judgment involved in the occasional job-shadowing training . . . or in any other purported 'team lead' duty." *Id.* (citing [ECF 38-1] at 25-26, 116-17, 139-40). Thus, the parties also raise factual disputes regarding whether the team lead function satisfies the third requirement of the alternative primary duty test.

As result of these factual disputes and the extent of the record on the nature and scope of the team lead function, the Court does not have an adequate basis upon which to conclude that

the team lead function satisfies the requirements of an alternative primary duty. *See Adams v. United States*, No. 98-5011, 1998 WL 804552, at *4 (Fed. Cir. Sept. 23, 1998). Furthermore, the Court cannot weigh the limited evidence relied upon by the parties to reach a conclusion on this issue. *Anderson*, 477 U.S. at 249 (stating that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"); *see also Grandits*, 66 Fed. Cl. at 523 (citing *Anderson*, 477 U.S. at 249; *Jay*, 998 F.2d at 982) (explaining that "[t]he judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding"). Consequently, the Court does not "credit" the team lead function "as the primary duty for exemption purposes." 5 C.F.R. § 551.104. The Court's inability to determine whether the team lead function constitutes an alternative primary duty also prevents it from analyzing whether the team lead function, if credited as the primary duty, would qualify for the administrative exemption under 5 C.F.R. § 551.206.

> 2.    The Plaintiffs' Primary Duty of "Watch" Does not Qualify for an
>       Administrative Exemption.

The Court next analyzes whether the primary duty of "maintaining 24/7 global situational awareness" or "watch" qualifies for the administrative exemption. To qualify for the administrative exemption, the watch function must "directly relate[] to the management or general business operations" of the ODNI, "as distinguished from [its] production functions." 5 C.F.R. § 551.206. Additionally, the watch function must "include[] the exercise of discretion and independent judgment with respect to matters of significance." *Id.*[5]

With regards to "whether the primary duty is directly related to the employer's management or business operations, as distinguished from production functions," *Shea*, 136 Fed. Cl. at 103, OPM regulations provide the following definition of management:

> Management means performing activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or financial records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the

---

[5] The requirements of 5 C.F.R. § 551.206 are in the conjunctive. *Fowler v. OSP Prevention Grp.*, 38 F.4th 103, 106 (11th Cir. 2022) (citing *McKeen-Chaplin v. Provident Sav. Bank*, FSB, 862 F.3d 847, 849 n.1 (9th Cir. 2017)); *see Shea*, 143 Fed. Cl. at 332-33 (requiring the government to satisfy all elements of the administration exemption). Therefore, the government must demonstrate both requirements for the administrative exemption to apply.

> property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

5 C.F.R. § 551.104. Section 541.201 of Title 29 of the Code of Federal Regulations further states:

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a).[6] The government asserts that the "primary duty of Senior Watch Officers was directly related to the management or general business operations of the ODNI or ODNI's customers" because "Senior Watch Officers were engaged in assisting and supporting management activities to include training and leading Watch Officers on their team, apportioning and directing their work, monitoring and overseeing their work, and ultimately being responsible for the work produced as the 'team lead' representing the Government." [ECF 35] at 20 (capitalization omitted). The plaintiffs contend that "[t]he Government cannot demonstrate that Plaintiffs' primary duty was directly related to management or operations, because their 'entire job' (in the Government's own words) was to perform the main production function of the Watch Office: watch." [ECF 38] at 24. Further, the plaintiffs argue that their "primary duty as Watch Officers falls squarely within the core mission of the organization; it is a quintessential production function," and that "[t]he Government appears to concede that being on watch does not constitute 'management or general business operations,' making no argument on that point . . . focusing instead on their role as 'team leads.'" *Id.*

Because the plaintiffs' watch function—researching, analyzing, and disseminating intelligence information—is a production function, the Court finds that it is not directly related to the management or general business operations of the ODNI. In analyzing whether the watch function performed by the plaintiffs relates to ODNI management or general business operations, the Court views United States Department of Labor ("DOL") guidance on an analogous position—public-sector inspectors or investigators—as instructive. *See Grandits*, 66 Fed. Cl. at 550 (analyzing whether plaintiffs' positions are sufficiently analogous to position descriptions in DOL materials to justify an FLSA exemption).[7] The DOL Field Operations Handbook provides:

---

[6] The United States Department of Labor ("DOL") "regulations can be used to shed light on the [FLSA]," as here where it provides a definition "helpful to our construction of not only the FLSA, but also OPM regulations." *Grandits*, 66 Fed. Cl. at 531 n.10 (third alteration in original) (quoting *Adams v. United States*, 26 Cl. Ct. 782, 786 (1992)) (listing authorities supporting the use of DOL regulations in interpreting and applying the FLSA as specified in OPM's regulations).

[7] *See also Avalos v. United States*, 54 F.4th 1343, 1350 n.1 (Fed. Cir. 2022) ("[DOL] guidance is not directly applicable to federal employees like [the] plaintiffs, for whom the FLSA is implemented by the [OPM] . . . . But, in general, Congress has advised the [OPM] to administer the provisions of law in such a manner as to assure consistency with the meaning, scope, and application [of] rulings, regulations, interpretations, and opinions of the

9

> Public-sector inspectors or investigators of various types . . . are generally *non-exempt*. Their primary duty is typically to perform the services that their agency exists to perform. For example, in law-enforcement organizations, investigation activities are among the primary, day-to-day functions of the business. Further, their work typically involves using skills and technical abilities to gather factual information, apply known standards or prescribed procedures, determine which procedure to follow, and determine whether prescribed standards or criteria are met.

U.S. Dep't of Labor, Wage & Hour Div., Field Operations Handbook § 22j21 (2021) ("DOL Handbook") (emphasis added). Thus, where an employee's primary duty involves the use of skills and technical abilities to gather information and the application of known standards or prescribed procedures, their primary duty is typically a production function unrelated to management or general business operations and is generally non-exempt. *Id.* Additionally, the DOL distinguishes "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter No. FLSA2005-21, at 4 (Aug. 19, 2005) ("DOL Opinion Letter") (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)); *see also* DOL Handbook § 22c01(b). In doing so, the DOL concludes that where "the primary duty of the [employee] is diligent and accurate fact-finding, according to [agency] guidelines, the results of which are turned over to [the agency] . . . . [the employee's] activities, while important, do not directly relate to the management or general business operations of the employer within the meaning of the regulations." DOL Opinion Letter, at 4.

Here, the plaintiffs' primary duty to "watch," like the primary duty of public-sector investigators, was to conduct diligent and accurate fact finding according to prescribed agency guidelines. During each shift, the plaintiffs monitored one of three stations and provided relevant information to ODNI customers. *See* [ECF 35] at 3, 5; [ECF 38] at 10. Such information was gathered and reported according to agency guidelines. *See* [ECF 35-1] at 53-76 (DNI training manual specifying priorities); *id.* at 112-46 (DNI training manual "Standard Operating Procedure" for Watch Officers, including email templates, intelligence production instructions, watch report templates, telephone procedures with scripted statements, conference call procedures, intelligence cable procedures with recording and citation guidelines, and open source/press reporting procedures); [ECF 38-1] at 170-87 (email and reporting templates, intelligence production instructions, watch report templates, telephone procedures with scripted statements, and conference call procedures). The plaintiffs performed the services that the agency exists to perform—to "provide[] 24/7 global intelligence situational awareness in support of ODNI's mission," [ECF 35-1] at 123; *see also id.* at 48 (stating that ODNI's mission is to "[l]ead and support Intelligence Community integration; delivering insights, driving capabilities, and investing in the future."). In sum, the plaintiffs' watch function directly relates to the production of the ODNI commodity—the gathering and reporting intelligence information—

---

Secretary of Labor which are applicable in other sectors of the economy.") (internal quotation marks and citations omitted).

rather than to the administration of the ODNI enterprise. Furthermore, the plaintiffs' official position description identifies their mission category as "Analysis & Production" and "Processing & Exploitation," rather than "Enterprise Management & Support," "Research & Technology," or "Mission Management." [ECF 35-1] at 260; *see also id.* at 262 (describing the plaintiffs' GS Work Category as "Professional" rather than "Supervisory/Managerial" or "Technical/Admin Support"). Accordingly, the plaintiffs' primary duty of performing the watch function was not directly related to managing ODNI's business in a manner that would satisfy the requirements of the administrative exception.[8]

Regarding the requirement that the primary duty "include the exercise of discretion and independent judgment with respect to matters of significance," the regulations provide:

(a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b) The phrase *discretion and independent judgment* must be applied in light of all the facts involved in the particular employment situation in which the question arises.

\* \* \*

(f) . . . [E]mployees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances will be nonexempt.

---

[8] The government argues that the plaintiffs "supported management functions by assisting with developing, interpreting and overseeing agency-wide policy and procedures." [ECF 35] at 21. However, the government has not demonstrated, nor does the evidence support a conclusion, that these activities constituted the plaintiffs' primary duty. The government also contends that the plaintiffs "serve[d] as advisers to their employer, ODNI and its customers that is akin to providing research under 29 C.F.R § 541.201(b)." *Id.* at 22; *see also* [ECF 39] at 15 (asserting that the "primary duties of a Senior Watch Officer fall within DOL's express definition of 'directly related to the management of general business operations' as 'work directly related to assisting with the running or servicing of the business . . . .' which includes functional areas such as research and government relations" (internal citations omitted)). The government misapplies the adviser function to the plaintiffs. The management and business operations requirement may be satisfied by "employees acting as advisors or consultants to their employer's clients or customers *for a fee*—such as tax experts, financial consultants, or management consultants." DOL Handbook § 22c01(c)(1) (emphasis added); *see also* 29 C.F.R. § 541.201(c) (stating that "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt"). The plaintiffs did not serve as these types of advisors. Furthermore, the government misapplies the activities listed under 29 C.F.R. § 541.201(b). That the plaintiffs' primary "watch" function may also be viewed as performing research or government relations does not convert the "watch" function from a production function into one that is directly related to management or business operations. Based on the evidence, any research or government relations activities performed by the plaintiffs were directly related to ODNI's mission, as opposed to its administration. *Fowler*, 38 F.4th at 110-11 (distinguishing between work related to the employer's core function and work related to the employer's management and administration).

5 C.F.R. § 551.206 (emphasis added). Here, the plaintiffs' watch function did not involve the exercise of discretion and independent judgment with respect to matters of significance. The ODNI "had clearly defined expectations in writing on how to do most, if not all, . . . daily duties and responsibilities." [ECF 38-1] at 18-19 (quoting Seth T.'s deposition). The plaintiffs followed numerous email templates and instructions for generating reports and used established distribution lists to perform their duties. *See* [ECF 35-1] at 53-76 (DNI training manual specifying priorities); *id.* at 112-46 (DNI training manual "Standard Operating Procedure" for Watch Officers, including templates and instructions); [ECF 38-1] at 170-87 (email and reporting templates, general instructions, and procedures). In this manner, the plaintiffs' watch function consisted of determining which prescribed procedures to follow, following the prescribed procedures, and deciding whether the standards in the procedures were met. This is insufficient to demonstrate that the plaintiffs exercised discretion and independent judgment as required to qualify for the administrative exemption under 5 C.F.R. § 551.206. *See also* 29 C.F.R. § 541.202; DOL Opinion Letter, at 4 (finding that non-exempt investigators whose work "typically involves the use of skills in applying known standards or established techniques, procedures or specific standards, as distinguished from work requiring the exercise of discretion and independent judgment as required for exemption under 29 C.F.R. § 541.202"). Therefore, the Court finds that the plaintiffs' watch function does not involve the exercise of discretion and independent judgment with respect to matters of significance.[9]

**B.      The Plaintiffs' Work Schedule**

The parties also disagree as to the method for calculating overtime pay. Most federal government agencies "establish a basic administrative workweek of 40 hours for each full-time employee," 5 U.S.C. § 6101(a)(2)(A), under which "the basic nonovertime workday may not exceed 8 hours," *id.* § 6101(a)(3)(D). Any work performed outside of this basic schedule is generally considered overtime work subject to overtime pay. *Id.* § 5542(a), (c). Under the Federal Employees Flexible and Compressed Work Schedules Act of 1978 ("Work Schedules

---

[9] The government argues that "Senior Watch Officers would have to analyze whether certain criteria were met and use their judgment to determine whether certain information was high-profile and when and how to alert." [ECF 35] at 25; *see also* [ECF 35-1] at 390-91 (Karen M.'s deposition). They contend that "Senior Watch Officers had to rely on their judgment and discretion to determine whether it merited directly calling the DNI herself and alerting her in the middle of the night." *Id.* at 26 (citing Ms. Williams' deposition). They further argue that "work dealt with matters of significance because it contained intelligence on national security matters across the globe and in functional areas that could affect the safety of the American people and U.S or allied interests." *Id.*; *see also* [ECF 39] at 23. Contrary to the government's characterizations, the determinations made by the plaintiffs were governed by established policies and procedures. *See* [ECF 35-1] at 53-76, 112-46; [ECF 38-1] at 170-87; *see also Grandits*, 66 Fed. Cl. at 542 (quoting *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 404 (6th Cir. 2004)) ("The very purpose of such detailed regulations and procedures is to create conformity which has the practical effect of minimizing discretion."). Furthermore, the decisions made by the plaintiffs in performance of their watch function did not involve matters of significance to ODNI's operations. *See Shea*, 143 Fed. Cl. at 335 (explaining that "while judgments over the course of an operation may aggregate into having a substantial effect on the operation, any one individual tactical action might not have a perceptible effect and even the cumulative decisions in one surveillance operation might not affect [the agency's] operations, as a whole, to a substantial degree"). While the plaintiffs' decisions when performing the watch function may deal with important matters of national security, they do not relate to the operation or administration of the ODNI. *See Fowler*, 38 F.4th at 114 (stating that "the [administrative] exemption is not for all of those who do important work; it is only for those who do administrative work"). The Court is, therefore, not persuaded by the government's arguments.

Act"), *id.* at § 6120 *et seq.*, Congress authorized government agencies to use "flexible and compressed work schedules . . . to improve productivity in the Federal Government and provide greater service to the public," *id.* at § 6120. With respect to flexible work schedules, the statute provides:

> Notwithstanding section 6101 of this title, each agency may establish, in accordance with this subchapter, programs which allow the use of flexible schedules, which include—
>
> (1) designated hours and days during which an employee on such a schedule must be present for work; and
>
> (2) designated hours during which an employee on such a schedule may elect the time of such employee's arrival at and departure from work, solely for such purpose or, if and to the extent permitted, for the purpose of accumulating credit hours to reduce the length of the workweek or another workday.
>
> An election by an employee referred to in paragraph (2) shall be subject to limitations generally prescribed to ensure that the duties and requirements of the employee's position are fulfilled.

5 U.S.C. § 6122(a). Further, regarding compressed work schedules, the statute provides that "[n]otwithstanding section 6101 of this title, each agency may establish programs which use a 4-day workweek or other compressed schedule." *Id.* § 6127. A compressed work schedule, "in the case of a full-time employee, [is defined as] an 80-hour biweekly basic work requirement which is scheduled for less than 10 workdays." *Id.* § 6121(5). Additionally, under the Work Schedules Act, OPM is charged with "prescrib[ing] regulations necessary for the administration of the [work schedule] programs." *Id.* § 6133(a).

Several years after the Work Schedules Act became law, the President issued two executive memoranda "direct[ing] the [OPM] . . . to take all necessary steps to support and encourage the expanded implementation of flexible work arrangements." Expanding Family-Friendly Work Arrangements in the Executive Branch, 59 Fed. Reg. 36017, 36017 (July 11, 1994); *see also* Memorandum on Family Friendly Work Arrangements, 1 Pub. Papers 962 (June 21, 1996). In connection with this direction, the OPM issued guidance "to provide a framework for Federal agencies to consult in establishing alternative work schedules and to provide additional information to assist agencies in administering such programs." *See* U.S. Off. of Pers. Mgmt., Handbook on Alternative Work Schedules (1996) ("OPM AWS Handbook"). The AWS programs aimed to "enable managers and supervisors to meet their program goals while, at the same time, allowing employees to be more flexible in scheduling their personal activities." *Id.* In addition to the memoranda, OPM cites the Work Schedules Act—specifically 5 U.S.C. § 6122 on flexible work schedules and 5 U.S.C. § 6127 on compressed work schedules—as authority for the AWS programs. *Id.* The OPM AWS Handbook defines an AWS as "[b]oth flexible work schedules and compressed work schedules." *Id.* It states that "[t]here is no authority to establish hybrid work schedules that borrow selectively from the authority for

flexible work schedules and the authority for compressed work schedules in an effort to create a hybrid work schedule program providing unauthorized benefits for employees or agencies." *Id.* (citing U.S. Gen. Acct. Off., B-179810, Comp. Gen. Rep. (Dec. 4, 1979); Gen. Servs. Admin. & Nat'l Fed'n of Fed. Emps., 50 F.L.R.A. 136 (Feb. 23, 1995)). It notes, however, "that some forms of flexible work schedules (e.g., *maxiflex*) allow work to be compressed in fewer than 10 workdays in a biweekly pay period." OPM AWS Handbook (emphasis added). It also clarified that "compressed work schedules are always fixed schedules." *Id.*

Unlike flexible and compressed work schedules, "maxiflex" schedules are not defined by statute. However, relying on the authority it was granted by the Work Schedules Act, OPM provides the following definition for a "maxiflex" schedule:

> A type of flexible work schedule that contains core hours on fewer than 10 workdays in the biweekly pay period and in which a full-time employee has a basic work requirement of 80 hours for the biweekly pay period, but in which an employee may vary the number of hours worked on a given workday or the number of hours each week within the limits established for the organization.

OPM AWS Handbook; *see also* U.S. Off. of Pers. Mgmt., Fact Sheet: Maxiflex Work Schedules (2024) ("OPM Maxiflex Factsheet"). Under a "maxiflex" work schedule, a full-time employee "must have a basic work requirement of 80 hours in a biweekly pay period," and the agency "must establish flexible hours and core hours." OPM Maxiflex Factsheet. "Core hours refer to the designated period(s) on specified days when all employees covered by the approved [flexible work schedule] must be working." *Id.* "Agencies may designate the number of core hours each week to meet their mission needs and are not required to have core hours on every workday." *Id.* "[A]gencies may choose not to establish core hours on each workday, thus providing maximum flexibility for employees." *Id.* "Because of the absence of core hours on one (or more) of the normal workdays, an employee may work fewer than 10 days in a biweekly pay period under a maxiflex work schedule." *Id.* Flexible hours are those "hours during which an employee may choose to vary their starting or stopping times (or times of arrival to and departure from the work site) consistent with the duties and requirements of the position." *Id.* "An agency may establish limitations on when basic work requirement hours may be performed—for example, the days of the week on which an employee may perform such hours and limits on the number of such hours on a given day." *Id.*

The government initially contends that the "plaintiffs are not entitled to overtime pay based on a standard work schedule (8-hour day or 40-hour week) because their basic work requirement was a non-standard shift schedule (12-hour shift, 80-hour bi-weekly) that only entitled them to overtime pay for hours performed above their non-standard shift schedule." [ECF 35] at 27 (emphasis and capitalization removed). Specifically, the government argues that the ODNI correctly classified the plaintiffs' "non-standard shift schedule as a 'compressed schedule.'" *Id.* In its reply, however, the government states that "[i]t is undisputed that plaintiffs' work schedule did not entirely consist of a fixed schedule and therefore ODNI did not implement plaintiffs' work schedule under a [compressed work schedule] program." [ECF 39] at 27. Further, the government contends in its reply that "plaintiffs worked a . . . 'maxiflex schedule'

14

that falls within the [flexible work schedule] program, which allowed work to be compressed in fewer than 10 workdays in a biweekly pay period that did not require their schedule to be entirely fixed as required under a [compressed work schedule]." *Id.* at 29. The plaintiffs counter that they "are entitled to overtime pay for working in excess of 8 hours each day and 40 hours each week," [ECF 38] at 31, on the basis that they were not working a compressed schedule or a flexible schedule, *id.* at 35, 37. They also assert that their "schedule did not meet any of the criteria that would permit the Government to use alternative rules for calculating their overtime pay." [ECF 40] at 23. According to the plaintiffs, "the parties agree" that the plaintiffs "could not lawfully be paid according to the rules that apply to compressed schedules." *Id.* at 23. Additionally, the plaintiffs contend that the record does not support a conclusion that the plaintiffs' schedule qualified as a flexible schedule. *Id.* at 23-24.

The parties do not dispute the plaintiffs' work schedule. Their basic work requirement consisted of twelve-hour shifts that satisfied an eighty-hour biweekly requirement. *See* [ECF 35] at 10; [ECF 38] at 13. The plaintiffs were on a five-week work cycle that consisted of two weeks of twelve-hour day shifts, two weeks of twelve-hour night shifts, and one administrative week. [ECF 35] at 10; [ECF 38] at 13. During the shift weeks, the plaintiffs "were required to perform 36 hours or 48 hours of work, which was scheduled for three or four days respectively." [ECF 35] at 28. The twelve-hour shifts "began and ended at the same time each day at 0400 and 1600." [ECF 35] at 10; *see also* [ECF 40] at 20. Also, the plaintiffs were scheduled for specific shift days, were required to be present for the entire shift, and could not vary their arrival and departure times. [ECF 35] at 10; [ECF 38] at 13-14. During their non-shift week, the plaintiffs were afforded flexibility with respect to the days and hours worked. [ECF 35] at 10; [ECF 38] at 14. Although the plaintiffs were required to work their hours during weekdays, [ECF 35] at 10, they were free to select their workdays, as well as their arrival and departure times, *id.*; [ECF 38] at 14.

The Court finds that the plaintiffs' work schedule does not constitute a flexible or compressed work schedule. As the government concedes, the plaintiffs' work schedule is not a compressed schedule because it is not entirely fixed. *See* [ECF 39] at 6 ("It is undisputed that plaintiffs' work schedule did not fall under a compressed work schedule (CWS) program because it was not entirely fixed."). As noted above, an agency is authorized to "establish [a work schedule] which use[s] a 4-day workweek or other compressed schedule" to satisfy an eighty-hour biweekly basic work requirement. 5 U.S.C. § 6127; *see also id.* § 6121(5). However, as stated in the OPM AWS Handbook, a compressed schedule must be entirely fixed. *See* OPM AWS Handbook ("Compressed work schedules are always fixed schedules."); *see also* U.S. Gen. Acct. Off., B-179810, Comp. Gen. Rep., at 2 n.1 (Dec. 4, 1979) (explaining that the difference between flexible and compressed schedules "is that employees on a flexible schedule can choose the days/hours they want to work; those on a compressed schedule are required to work a fixed schedule"). That a compressed schedule must be entirely fixed is further supported by the method prescribed for calculating overtime under a compressed schedule. Under a compressed schedule, overtime hours are "any hours in excess of those specified hours which constitute the compressed schedule." 5 U.S.C. § 6121(7). Thus, the agency is required to specify the hours to be performed under a compressed schedule (i.e. establish a fixed work schedule) in order to determine which hours constitute overtime. Because the work schedule established by the ODNI includes a workweek that is not fixed—the administrative week—it does not constitute a

compressed work schedule.

Additionally, the plaintiffs' work schedule does not constitute a flexible schedule. Under the Work Schedules Act, an agency is authorized to establish a flexible work schedule that includes *both* "designated hours and days during which an employee on such a schedule must be present for work" *and* "designated hours during which an employee on such a schedule may elect the time of such employee's arrival at and departure from work." 5 U.S.C. § 6122(a)(1)-(2). During their four weeks of twelve-hour shifts, there were designated hours and days during which the plaintiffs were required to be present for work. *See* [ECF 38-1] at 44-45 (Seth T. affirming that Watch officers' schedules were "fixed in advance" except for the administrative week, where "the days that was admin week was set, but hours to work during admin week was not set"); *id.* at 150-51 (Karen M. stating that Watch Officers "didn't have flexibility when they were on shift," but "would have flexibility during their admin week" and that they "were on the strict 12-hour shift" for non-administrative weeks). However, such shifts did not include designated hours on those days during which the plaintiffs could elect the time of their arrival and departure. *Id.* Because the plaintiffs' work schedule does not provide flexibility to elect arrival and departure times on each designated workday, it is not a flexible schedule. The government nevertheless argues that the plaintiffs' work schedule constituted a "'maxiflex schedule,' that by definition allows a compressed schedule." [ECF 39] at 27. However, a "maxiflex" schedule is a type of flexible work schedule. OPM AWS Handbook. While it permits "core hours on fewer than 10 workdays in the biweekly pay period" like a compressed schedule, a "maxiflex" schedule still requires that the employee have flexibility on designated workdays. *Id.*; *see also* 5 U.S.C. § 6122(a)(1)-(2). Here, there was no such flexibility.[10]

In sum, the Court finds that the plaintiffs were not properly placed on a compressed or a flexible schedule for the purposes of calculating overtime pay. Rather, the record shows that the plaintiffs' work schedule consisted of a compressed schedule for the four weeks and a flexible schedule for the administrative week. This type of hybrid work schedule is not authorized under the Work Schedules Act. *See* OPM AWS Manual (stating that "[t]here is no authority to establish hybrid work schedules"); *see also* Gen. Servs. Admin., 50 F.L.R.A. at 138-39 (adopting OPM's interpretation of the Work Schedules Act as prohibiting the combination of flexible and compressed schedules).[11]

---

[10] Furthermore, the government presents no evidence that ODNI took proper steps to establish a "maxiflex" schedule, such as outlining the core and flexible hours or the requirements surrounding credit hours. *See* [ECF 35-1] at 30, 31 (ODNI instruction 73.07 ¶ 6.B.(3)(h)(ii) stating that the establishment of an AWS program requires the Component Director to "[s]et the core work hours and flexible time bands," "[s]et the restrictions on the maximum number of hours that an employee may work daily," "[s]tate whether occasional work on Saturday and Sunday, and work on a holiday, will be permitted under a flexible schedule to meet the basic work requirement," and "[s]et restrictions on the number of credit hours earned and when credit hours are earned in an applicable [flexible work schedule]").

[11] The government also argues that the plaintiffs were on a "non-standard" schedule. [ECF 35] at 10; [ECF 39] at 27 (citing 5 U.S.C. § 6101; OPM AWS Handbook, Exceptions). However, there is no evidence that the ODNI established a "non-standard" schedule. The plaintiffs' schedule did not qualify as "non-standard" under the ODNI's instructions because it did not include one regular day off per week nor was it recorded as a compressed work schedule. *See* [ECF 35-1] at 29-30 (ODNI instruction 73.07 ¶ 6.B.(2)(c), (e)). Furthermore, under the Work Schedules Act, an agency may establish a non-traditional workweek if "the head of [the] agency . . . determines that his organization would be seriously handicapped in carrying out its functions or that costs would be substantially

## IV.    CONCLUSION

For the reasons stated above, the government's motion for summary judgment, [ECF 35], is **DENIED**, and the plaintiffs' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. The plaintiffs' motion is **GRANTED** with respect to whether the plaintiffs were properly placed on an AWS and **DENIED** with respect to whether the plaintiffs are exempt under the FLSA. Further proceedings are required to determine whether the team lead function performed by the plaintiffs constitutes an alternative primary duty for the purposes of the administrative exemption under the FLSA and whether the plaintiffs are entitled to overtime pay under the FLSA.[12]

The parties **SHALL CONFER** and **FILE** a joint status report **on or before June 9, 2025**, proposing a schedule for further proceedings in this case.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
Thompson M. Dietz, Judge

---

increased." 5 U.S.C. § 6101(a)(3); *see also* OPM AWS Handbook, Exceptions (recognizing that agencies have authority to establish non-standard work schedules under 5 U.S.C. § 6101). Yet, the government has provided no evidence that the head of the ODNI established a non-standard schedule under this authority.

[12] In their respective cross-motions, the parties dispute whether the plaintiffs have properly raised a claim for off-the-clock overtime and improperly recorded hours. The government asserts that this claim should be dismissed, and the plaintiffs assert that this claim should remain for trial. *See* [ECF 35] at 30-32; [ECF 38] at 41-43. The Court views this claim as part of the first count in the plaintiffs' complaint, "Failure to Properly Compensate Plaintiffs for Overtime under FLSA." [ECF 1] ¶¶ 24-25. Therefore, this claim shall remain subject to further fact finding.